## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

**TESSA FARMER,**

      **Plaintiff,**

      **v.**                             **Case No. 16-CV-2256-JAR-GEB**

**KANSAS STATE UNIVERSITY,**

      **Defendant.**

## MEMORANDUM AND ORDER

Plaintiff Tessa Farmer brings this action against Defendant Kansas State University ("KSU"), alleging that KSU failed to adequately respond after Plaintiff, a KSU student, reported she was sexually assaulted at a KSU fraternity.  Plaintiff alleges the following three claims: (1) violation of Title IX; (2) violation of the Kansas Consumer Protection Act ("KCPA"); and (3) negligence.  This matter comes before the Court on KSU's Motion to Dismiss for Failure to State a Claim (Doc. 14).  The parties have fully briefed the motion.

Additionally, the United States has filed a Statement of Interest (Doc. 32), to which KSU has responded (Doc. 44).  The United States submits its Statement of Interest pursuant to 28 U.S.C. § 517, which provides that

> [t]he Solicitor General, or any officer of the Department of Justice, may be sent by the Attorney General to any State or district in the United States to attend to the interests of the United States in a suit pending in a court of the United States . . . or to attend to any other interest of the United States.

The United States asserts it has an interest in this case because the United States Departments of Justice and Education share responsibility for enforcing Title IX in the education context, and because it has an interest in ensuring "effective private enforcement of Title IX in court."[1]  KSU

---

[1]Doc. 32 at 2.

argues that the Court should not consider the United States' Statement of Interest, because Plaintiff's administrative complaint is still pending before the Department of Education's Office of Civil Rights ("OCR"), and thus the United States should remain neutral in this litigation. Notwithstanding the apparently ongoing administrative proceedings before the OCR, the Court sees no reason why the United States cannot submit a statement of interest pursuant to § 517 to advance the various interests it has identified.   Accordingly, the Court has considered the United States' Statement of Interest as well as KSU's response thereto.

Having considered the parties' and the United States' briefings, the Court is now prepared to rule.  For the reasons stated in detail below, the Court grants in part and denies in part KSU's motion to dismiss.

## I.        Standard

To survive a motion to dismiss for failure to state a claim, a complaint must present factual allegations, assumed to be true, that "raise a right to relief above the speculative level," and must contain "enough facts to state a claim to relief that is plausible on its face."[2]  To state a claim for relief under Rule 12(b)(6), "the complaint must give the court reason to believe that *this* plaintiff has a reasonable likelihood of mustering factual support for *these* claims."[3]  The plausibility standard does not require a showing of probability that a defendant has acted unlawfully, but requires more than "a sheer possibility."[4]  "[M]ere 'labels and conclusions,' and 'a formulaic recitation of the elements of a cause of action' will not suffice; a plaintiff must offer specific factual allegations to support each claim."[5]  Finally, the Court must accept the

---

[2]*Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007).

[3]*Ridge at Red Hawk, L.L.C. v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007).

[4]*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

[5]*Kan. Penn Gaming, LLC v. Collins*, 656 F.3d 1210, 1214 (10th Cir. 2011) (quoting *Twombly*, 550 U.S. at 555).

nonmoving party's factual allegations as true and may not dismiss on the ground that it appears unlikely the allegations can be proven.[6]

The Supreme Court has explained the analysis as a two-step process.  For the purposes of a motion to dismiss, the court "must take all the factual allegations in the complaint as true, [but] we 'are not bound to accept as true a legal conclusion couched as a factual allegation.'"[7]  Thus, the court must first determine if the allegations are factual and entitled to an assumption of truth, or merely legal conclusions that are not entitled to an assumption of truth.[8]  Second, the court must determine whether the factual allegations, when assumed true, "plausibly give rise to an entitlement to relief."[9]  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[10]

## II.    Background

The following facts are taken from Plaintiff's Complaint and are construed in the light most favorable to Plaintiff.  At all times relevant to this case, Plaintiff was a student at KSU.

### KSU Fraternities

KSU fraternities are student housing organizations that are open only to KSU students. On its website, KSU describes its fraternities as "Kansas State University Organizations." Plaintiff alleges that 21% of the undergraduate population at KSU is affiliated with campus fraternities and sororities.  The fraternities collect rent and dues from their student members, and provide housing at off-campus locations.  The fraternities are overseen by national chapters as

---

[6]*Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556).

[7]*Id.*

[8]*Id.* at 679

[9]*Id.*

[10]*Id.* at 678.

well as by KSU.  The Director of the fraternity relevant to this cause of action is a KSU

instructor.

In its promotional materials, KSU describes the relationship between the University and

the Greek Community:

> The Greek community at Kansas State University has been in existence since
> 1913, with a continuing tradition of excellence. Through the years we have been a
> community that fosters academic excellence, leadership ability, philanthropic
> services, and active contributions to both the campus and Manhattan
> communities. Our Greek community consists of 17 sororities and 28 fraternities,
> with a total membership of almost 4,000 undergraduate students. While each
> organization maintains its own activities, traditions, and national affiliations, each
> is founded on similar principles of scholarship, leadership, community service,
> and lifelong friendship.[11]

KSU further states in materials intended for parents of students:

> The Greek experience at K-State provides a safe and fun way to maximize the
> college experience.  Your son or daughter will also find personal growth and
> development extending far beyond his or her years on campus.[12]

Additionally, KSU employs five individuals in its Office of Greek Affairs, which is

located in the KSU Student Union.  The Office of Greek Affairs is responsible for carrying out a

number of functions to support fraternities and sororities, including administrative assistance,

advisory responsibilities, education and development, serving as a liaison to chapter presidents,

holding regular meetings with chapters, and conducting chapter assessments.  KSU has the

authority to regulate fraternity houses, and promulgates rules for regulating parties and certain

other activities at fraternity houses and events.

**Alleged Sexual Assault**

On Friday, March 6, 2015, Plaintiff went with a group of friends to a KSU fraternity

party, where members passed out margaritas and beer.  Another person at the party carried

---

[11]Doc. 1 at 12.

[12]*Id.*

around a bag of wine and gave people, including Plaintiff, drinks directly from the bag's spout. Plaintiff became very intoxicated.

At about 2:00 a.m., a designated driver took Plaintiff home.  Shortly thereafter, Plaintiff received a Facebook message from KSU student T.R., a member of the fraternity she had known since high school and had seen at the party.  T.R. told Plaintiff she should come to his fraternity house because they were "still turning up."  He was persistent, even offering to pick her up. Plaintiff relented, and T.R. picked her up and brought her to the fraternity house.  T.R. and Plaintiff went to his room and had sex.  Sometime later, T.R. told Plaintiff he was going to start his car, presumably to take her home, and he left Plaintiff alone in the room.

While T.R. was gone, Tessa discovered a stranger had been hiding in the closet.  She later learned he was C.M., another KSU student.  C.M. admitted T.R. had made him go into the closet. Plaintiff, inebriated and confused, fell face first onto a bed, where she blacked out.  C.M. pulled down Plaintiff's pants and penetrated her vaginally with his penis while pulling her hair and whispering in her ear.  Plaintiff regained consciousness and screamed into the mattress until he finished.  C.M. did not use a condom.  When T.R. returned, Plaintiff was sobbing and in shock. T.R. showed no surprise by his roommate's presence or by Plaintiff being so upset.

At 3:47 a.m., T.R. messaged Plaintiff again on Facebook to ask if she was on birth control.  He told her he was sorry she was so upset and he did not mean for that to happen. Plaintiff asked T.R. twice for the rapist's name over the following day.  T.R. did not respond and blocked Plaintiff on Facebook.

Plaintiff woke her roommate at about about 3:50 a.m. and told her she had been raped. Plaintiff's roommate accompanied Plaintiff to the hospital where she underwent a complete rape kit, an extremely intense and invasive process that takes hours.  The rape kit included an

examiner placing a probe in Plaintiff's vagina, taking samples off her skin and under her fingernails, combing through her pubic hair, and taking pictures of her body and vagina. Plaintiff received drugs to prevent transmission and to prevent pregnancy from the rape. After she was done getting treatment at the hospital, Plaintiff went to the Riley County Police Department ("RCPD") to report the rape. Her case is still under investigation by the police.

### Plaintiff's Report of Sexual Assault and KSU Response

On the Monday or Tuesday following the alleged rape, Plaintiff reported it to the KSU Center for Advocacy, Response, and Education ("CARE") director, Jenna Tripodi. Ms. Tripodi told Plaintiff she had two options: she could go to the RCPD or she could report the rape to the KSU Interfraternity Council ("IFC"). Ms. Tripodi told Plaintiff the IFC would not investigate the rape, the alleged assailant, or any other individuals, and instead would look only at the fraternity chapter more generally. Ms. Tripodi did not mention to Plaintiff KSU's sexual misconduct policy or Title IX, and she did not refer her to a Title IX coordinator. Ms. Tripodi also did not tell Plaintiff about the option to file a complaint against the student-assailant with the KSU Office of Institutional Equity ("OIE"), which investigates sexual assault, or that OIE could investigate what happened and potentially have the student-assailant removed from KSU. Plaintiff was not offered a no-contact order. Plaintiff was not told about KSU's sexual assault policies, and in response to her report of rape, no evaluation was done on the effects of the off-campus rape in the educational setting.

Plaintiff filed a complaint with the IFC on March 31, 2015. Five days later, the IFC notified the chapter it had completed its investigation and would take no further action. More than three months later, Plaintiff received a letter from the IFC stating that the IFC Judicial Board investigates chapter behavior, not individual behavior. The IFC Judicial Board

determined that the chapter as a whole had not violated any IFC policies.  Plaintiff learned that the student-assailant was sanctioned for alcohol use but not for Plaintiff's rape.  Plaintiff also reported the rape to a KSU professor, but no action came from this report.

The following summer Plaintiff became aware of Title IX, and learned that KSU could take disciplinary action and bring sanctions against the student-assailant.  On August 22, 2015, Plaintiff filed a complaint with KSU's OIE, copying Ms. Tripodi.  Ms. Tripodi replied, "The current Policy Prohibiting Discrimination, Harassment and Sexual Violence, K-State's Sexual Misconduct policy, specifies that it covers behaviors that happen[] on campus and at university sponsored events; which does not cover Fraternity Houses."[13]  Plaintiff next heard from a KSU investigator.  Plaintiff asked the investigator if it was true that KSU's current policy did not cover rapes at fraternity houses.  The investigator responded that Ms. Tripodi's statement was correct, but the investigator would nonetheless need to collect more information to determine if the rape related to discrimination in a KSU-sponsored program or activity.  Plaintiff responded to the investigator, in writing, as follows:

> My rapist is on my campus with me - isn't the risk of encountering him on campus while I am trying to get my education mean the discrimination is ongoing and related to campus?
>
> Let me know the questions you have to ask that aren't covered by my statement. There hasn't been any other incidents then [sic] what I reported.  I'd rather not have a meeting hanging over me if this is something you would [not] actually do anything about.  If you can take action, like suspend or expel the rapists, I am 100% on board to go through any interviews or investigative processes.  I think you should take that action, not only for me because I was raped, but because he shouldn't be free to do this to any other K-State students.  This was a truly horrific experience.
>
> Thank you,

---

[13]*Id.* at 6–7.

Tessa[14]

The investigator did not reply to Plaintiff, and after Plaintiff inquired again, the investigator did not answer her question directly.

The investigator later asked Plaintiff a series of questions about the assault and aftermath, to which Plaintiff replied:

> After the rape, I missed classes and had some struggles with school. I have not been able to make any changes to avoid encountering the rapist, because I don't [] exactly know what he looks like.  He was, and is, a stranger.  I have to walk around campus worrying that he'll be [in] class, approach me or be near me on the quad, or be at a greek event with me like homecoming.  It affects my education everyday, because I am always at risk of running in to him and it[']s all the more awful that I can't recognize his face.[15]

KSU asked Plaintiff if she needed "assistance with any accommodations related to [her] education at KSU as a result of this complaint."[16]  Plaintiff indicated she wanted the student-assailant out of school so she could freely and safely access her education.  KSU asked Plaintiff if she felt "safe in [her] current walk/ride route to campus each day,"[17] and Plaintiff responded by explaining her fears of the rapist on campus:

> I feel safe in my car, but everyday I have to drive right by the building where I was raped, which is scary and make[s] me anxious and reminds me that, unless K-State takes action against the rapists on campus, campus is not truly safe for me or anyone else.  I will feel much safer and more comfortable if K-State takes disciplinary action, and he is held responsible for what he did to me at a K-State fraternity.[18]

KSU then informed Plaintiff it would not further investigate the rape, citing its policy to not investigate off-campus sexual assaults unrelated to a University program or activity.  KSU

---

[14]*Id.* at 7.

[15]*Id.* at 7–8.

[16]*Id.* at 8.

[17]*Id.*

[18]*Id.*

suggested that Plaintiff avail herself of the "Wildcat Walks," where students accompany fellow students as they walk around campus, "Safe Ride," where fellow students drive students home on weekends, and gave her the telephone number for campus police. KSU did not investigate the student-assailant and did not take corrective action against him. Plaintiff alleges that KSU has in other circumstances exercised disciplinary control over off-campus reports of sexual assaults, including investigating a sexual assault by a KSU basketball player.

Following Plaintiff's reports, the student-assailant remained on campus, which placed her in fear that he could be in her classes or around any corner. Plaintiff missed classes, fell into a depression, and resorted to self-destructive behaviors, including self-medicating with extensive amounts of alcohol and slitting her wrist with a razor. Plaintiff also secluded herself from friends and withdrew from KSU and sorority events and participation in leadership positions. Plaintiff refused to participate in homecoming out of the risk of seeing her alleged assailant, and she began sleeping very long hours to avoid the feelings she had when she was awake. Plaintiff once saw T.R. on her way to class, and this experience threw her into a panic attack. Plaintiff alleges that as of the filing of her Complaint, T.R. remains a student on the KSU campus, and Plaintiff continues to worry about seeing him in class, at Greek events, or otherwise on campus.

### KSU Sexual Assault Policies

KSU defines "harassment" in the "academic environment" as conduct toward a person based on sex that "has the purpose and effect" of "creating an intimidating, hostile, or offensive educational environment for the person" or "unreasonably interfering with the academic performance or participation in any university-sponsored activity of the person" or "threatening the academic opportunities of the person" and is sufficiently severe or pervasive that it alters the

terms, conditions, or privileges of the person's academic opportunities or participation in university-sponsored activities."[19]

Plaintiff alleges that several KSU employees disagreed with the approach of not investigating fraternity sexual assault and expressed to University officials the concern that off-campus rape does affect a student's on-campus experience.  University officials told employees that because there is so much misconduct at fraternities, KSU had taken the position to do its best to not investigate or adjudicate that misconduct, including reports of rape, purposely attempting to maintain a chasm between KSU and incidents that happen off-campus.

## III.   Discussion

### A.      Count 1—Title IX Claim

Plaintiff alleges a violation of Title IX in Count 1 of the Complaint on the basis that KSU was deliberately indifferent to her report of sexual assault, which was so severe, pervasive, and objectively offensive as to deny her access to, and the benefits of, an educational program or activity of a federal funding recipient.  Title IX provides for a private right of action against a federally funded education institution based on peer sexual harassment "where the funding recipient acts with deliberate indifference to known acts of harassment in its programs or activities."[20]  As a threshold matter, to state a Title IX claim a plaintiff must allege that the discrimination occurred within an educational "program or activity" of the funding recipient.[21] Additionally, the plaintiff must allege that the funding recipient (1) has actual knowledge of, and (2) is deliberately indifferent to, (3) sexual harassment that is so severe, pervasive, and

---

[19]*Id.* at 8–9.

[20]20 U.S.C. § 1681(a); *Davis ex rel. LaShonda D. v. Monroe Cty. Bd. of Educ.,* 526 U.S. 629, 633 (1999).

[21]20 U.S.C. § 1681(a); s*ee Davis,* 526 U.S. at 633, 645–47 (explaining that Title IX liability is limited to circumstances wherein the funding recipient can be said "to 'expose' its students to harassment or 'cause' them to undergo it 'under' the recipient's programs").

objectively offensive as to (4) deprive access to the educational benefits or opportunities provided by the school.[22]  Finally, the plaintiff must allege that the funding recipient's deliberate indifference subjected her to harassment by, at a minimum, alleging that the deliberate indifference "'cause[d her] to undergo' harassment" or made her "liable or vulnerable" to it.[23]

A Title IX plaintiff may proceed under two theories of liability.  A plaintiff may allege that the funding recipient had actual knowledge of, and was deliberately indifferent to, prior complaints of harassment, which led to the current harassment for which redress is sought.[24] Alternatively, a plaintiff may allege that the funding recipient was on notice of, and was deliberately indifferent to, the plaintiff's complaints concerning the current harassment, which deprived the plaintiff of the educational benefits and opportunities provided by the funding recipient.[25]  In her Complaint, Plaintiff appears to proceed on both theories of liability.[26] However, in her response to KSU's motion, Plaintiff disclaims any theory of liability premised on notice of and deliberate indifference to sexual assaults that occurred prior to the sexual assault perpetrated against her.[27]  The Court therefore construes Plaintiff's claim as alleging that KSU had actual knowledge of and was deliberately indifferent to her report of sexual assault, rather than deliberately indifferent to known previous reports by other KSU students.

---

[22]*Rost ex rel. K.C. v. Steamboat Springs RE-2 Sch. Dist.*, 511 F.3d 1114, 1119 (10th Cir. 2008) (citing *Murrell v. Sch. Dist. No. 1, Denver, Colo.*, 186 F.3d 1238, 1246 (10th Cir. 1999)).

[23]*Davis*, 526 U.S. at 644–45.

[24]*Rost*, 511 F.3d at 1119.

[25]*Id.* (recognizing the two different theories of liability and the split among district courts as to whether "notice of the current harassment for which redress is sought triggers liability"); *see also Escue v. N. Okla. Coll.*, 450 F.3d 1146, 1152–53 (10th Cir. 2006).

[26]Doc. 1 at 17–18 (alleging that KSU had actual knowledge of both the sexual assault of Plaintiff and earlier instances of sexual assault against other K-State students, and alleging that KSU was deliberately indifferent to previous allegations of sexual assault at KSU fraternities, as well as Plaintiff's report of rape).

[27]Doc. 33 at 7 n.1.

KSU makes two primary arguments in support of its motion to dismiss Plaintiff's Title IX claim.[28]  First, KSU argues the alleged sexual assault did not occur within one of its "programs or activities."  Second, KSU contends that Plaintiff has failed to allege that its deliberate indifference to Plaintiff's reports of rape caused her to suffer further harassment.  KSU does not argue that Plaintiff has failed to allege the other four elements of a Title IX claim, i.e., actual knowledge, deliberate indifference, severe or pervasive harassment, and deprivation of access to education.[29]  The Court therefore confines its analysis to whether Plaintiff has alleged that the sexual assault occurred within a KSU "program or activity," and whether Plaintiff has alleged— and whether she was required to allege—further harassment after her report of rape.

1.      **Harassment Under an Education Program or Activity[30]**

Title IX is triggered only when harassment occurs within an "education program or activity" of the funding recipient.[31]  The term "program or activity" includes "all of the operations of . . . a college, university, or other postsecondary institution, or a public system of higher education."[32]  According to OCR regulations, "program or activity" also includes "any academic, extracurricular, research, [or] occupational training."[33]  Plaintiff and the United States also refer to Dear Colleague Letters and "Questions and Answers" documents issued by the OCR, which bear on the scope of Title IX liability and purport to interpret how Title IX applies

---

[28]KSU made a third argument, that is, Plaintiff failed to properly allege that KSU had any actual knowledge of or was deliberately indifferent to sexual assault reports prior to Plaintiff's report.  Doc. 15 at 20–24.  As explained above, Plaintiff has abandoned any Title IX claims premised on prior reports of sexual assaults of other students. Therefore, the Court need not address KSU's arguments as to actual knowledge and deliberate indifference regarding prior reports of sexual assault.

[29]*See* Doc. 38 at 12 n.3.

[30]The Court uses the term "harassment" to comport with the language of Title IX, not to suggest that Plaintiff's allegation of rape equates to mere harassment.  *See Samuelson v. Or. State Univ.*, 162 F. Supp. 3d 1123, 1132 n.3 (D. Or. 2016).

[31]20 U.S.C. § 1681(a); *Davis ex rel. LaShonda D. v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 644 (1999).

[32]20 U.S.C. § 1687.

[33]34 C.F.R. § 106.31.

to fraternities and sororities.  KSU responds that these documents do not carry the force of law and are not entitled to *Chevron* deference in part because they were not promulgated pursuant to notice-and-comment rulemaking.[34]  The Court agrees and therefore does not consider the Dear Colleague Letters and "Questions and Answers" documents in determining whether Plaintiff has alleged a plausible Title IX claim.[35]

In *Davis Next Friend of LaShonda D. v. Monroe County Board of Education*, the Supreme Court explained that harassment takes place under a "program or activity" of a funding recipient only when "the recipient exercises substantial control over both the harasser and the context in which the known harassment occurs."[36]  The Court found that the harassment at issue in *Davis* took place under a "program or activity" because the harassment occurred "during school hours and on school grounds—the bulk of G.F.'s misconduct, in fact, took place in the classroom."[37]

Since the ruling in *Davis*, courts have courts have repeatedly encountered Title IX cases in which sexual harassment or assault occurs off school grounds.  For example, in *Rost ex rel. K.C. v. Steamboat Springs RE-2 School District*, the Tenth Circuit found that a school district could have reasonably believed that it did not have responsibility or control over several incidents of harassment that occurred off school grounds and in private settings.[38]  The court

---

[34]*See generally Chevron, U.S.A., Inc. v. Nat. Res.'s Def. Council*, 467 U.S. 837 (1984).

[35]*See Christensen v. Harris Cty.*, 529 U.S. 576, 587 (2000) ("we confront an interpretation contained in an opinion letter, not one arrived after, for example, a formal adjudication or notice-and-comment rulemaking. Interpretations such as those in opinion letters—like interpretations contained in policy statements, agency manuals, and enforcement guidelines, all of which lack the force of law—do not warrant *Chevron*-style deference"); *Mission Grp. Kan., Inc. v. Riley*, 146 F.3d 775, 781–82 (10th Cir. 1998); *J.M. v. Dep't of Educ., State of Haw.*, No. 15-00405 LEK-KJM, 2016 WL 7029825, at *10 (D. Haw. Dec. 1, 2016) (holding that OCR Dear Colleague Letter was "merely aspirational" and "merely provide[d] guidance for schools, not requirements").

[36]*Davis*, 526 U.S. at 645.

[37]*Id.*

[38]511 F.3d 1114, 1122 (10th Cir. 2008).

explained that "there must be some nexus between the out-of-school conduct and the school" to impose Title IX liability.[39]  Applying this standard, the court held that the school district was not liable under Title IX in part because there was no nexus between out-of-school harassment and the school, where "the only link to the school was an oblique and general reference to harassment or teasing on the school bus or in the halls at school."[40]  By contrast, in *Simpson v. University of Colorado Boulder*, the Tenth Circuit reversed a district court's grant of summary judgment in favor of a university on the plaintiffs' Title IX claim.[41]  The court found the plaintiffs had presented sufficient evidence that the university exercised "control over the harasser and the environment in which the harassment occurs," because the sexual assaults at issue, which occurred at a private apartment off campus, were the result of an official policy by the university's football program to encourage female students to show recruits "a good time."[42]

In *Ostrander v. Duggan*, the Eighth Circuit held that a sexual assault of a university student by another student who was a member of a fraternity, at a private residence that was not owned by the fraternity or the university, was not harassment under a "program or activity."[43] The Eighth Circuit recently held in *Roe v. St. Louis University* that a sexual assault by a fraternity pledge perpetrated against another university student, at a party at an off-campus apartment, did not occur under a university "program or activity."[44]  In *C.R.K. v. U.S.D. 260*, this Court found reasonable a school principal's conclusion that harassment was "out of the school's jurisdiction and was up to criminal justice authorities to investigate," where the incident at issue

---

[39]*Id.* at 1121 n.1.

[40]*Id.*

[41]500 F.3d 1170, 1178–85 (10th Cir. 2007).

[42]*Id.*

[43]341 F.3d 745, 750–51 (8th Cir. 2003).

[44]746 F.3d 874, 884 (8th Cir. 2014).

did not take place on school grounds or at a school activity, and occurred when school was not in session.[45]   Finally, in *Samuelson v. Oregon State University*, the District of Oregon found that Title IX was not implicated based on a peer sexual assault, where both the alleged drugging and assault of the victim occurred at two separate off-campus apartments "that simply happened to be located in the same city as the university."[46]

Plaintiff alleges the following facts in her Complaint that reflect KSU's substantial control over both the assailant and the context in which the assault occurred here:  (1) KSU fraternities are student housing organizations that are open only to KSU students, and on its website, KSU describes its fraternities as "Kansas State University Organizations"; (2) the director of the fraternity at issue in this case is a KSU instructor; (3) KSU promotes its fraternities on its website and to prospective students and parents; (4) KSU employs five individuals on campus in its Office of Greek Affairs, which is responsible for carrying out a number of functions to support fraternities and sororities, including administrative assistance, advisory responsibilities, education and development, serving as a liaison to chapter presidents, holding regular meetings with chapters, and conducting chapter assessments; and (5) KSU has the authority to regulate fraternity houses, and promulgates rules for regulating parties and certain other activities at fraternity houses and events.  Additionally, Plaintiff has alleged plausible facts demonstrating that KSU had substantial control over the alleged assailant.  The alleged assailant is a student at KSU, and Plaintiff alleges "the student-assailant was sanctioned for alcohol use but *not* for raping her."[47]

---

[45]176 F. Supp. 2d 1145, 1164 (D. Kan. 2001).

[46]162 F. Supp. 2d 1123, 1131–32 (D. Or. 2016).

[47]Doc. 1 at 6 (emphasis in original); *see Davis ex rel. LaShonda D. v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 646–47 (1999) (concluding that schools may be liable under Title IX where they are deliberately indifferent to reports of peer sexual harassment and where "the harasser is under the school's disciplinary authority").

While Plaintiff's allegations do not reflect that KSU had *complete* control over the alleged assailant at the fraternity house, her allegations do reflect that KSU had *substantial* control over both the assailant and the fraternity. As the facts outlined above demonstrate, KSU allegedly devotes significant resources to the promotion and oversight of fraternities through its websites, rules, and Office of Greek Affairs. Additionally, although the fraternity is housed off campus, it is considered a "Kansas State University Organization," is open only to KSU students, and is directed by a KSU instructor. Finally, KSU sanctioned the alleged assailant for his alcohol use, but not for the alleged assault. Presented with these allegations, the Court is convinced that the fraternity is an "operation" of the University, and that KSU has substantial control over student conduct within the fraternity.

KSU argues that the alleged sexual assault at issue here did not occur within an education "program or activity." As an initial matter, the Court notes that KSU appears to have argued in its initial briefing that, as a general matter, activities occurring off campus and at private parties cannot give rise to Title IX liability.[48] KSU cites *Yeasin v. University of Kansas*, in which it argued in an amicus curiae brief "that Title IX does not require a school to sanction students for off-campus conduct."[49] In *Yeasin*, the Kansas Court of Appeals held that the University of Kansas did not have the authority to expel a student under Title IX for sexual harassment that occurred online, off campus, and not within a University sponsored program or activity.[50] KSU focuses on a statement the court made that "[i]t seems obvious that the only environment the

---

[48] Doc. 15 at 15, 19 ("Put simply, when sexual harassment occurs off university property and at a private event, there is no sexual harassment in the university's education programs and activities and thus no "substantial control" sufficient to trigger civil liability under Title IX."). KSU asserts in its reply that it has never argued "that it has *no* duty to investigate *any* sexual assaults that occur off campus." Doc. 38 at 19 (emphasis in original).

[49] 360 P.3d 423, 430 (Kan. Ct. App. 2015).

[50] *Id.* at 432.

University can control is on campus or at University sponsored or supervised events."[51] However, the Court made clear that it was not resolving "whether Title IX requires a recipient to Title IX funds to discipline off-campus conduct."[52]  To the extent KSU argues here for a general prohibition on Title IX liability for harassment that occurs off campus, such a bright-line rule is foreclosed by *Rost*.[53]  Instead, the determination whether Title IX is implicated turns on whether the education institution "exercises substantial control over both the harasser and the context in which the known harassment occurs," and whether there is a "nexus between the out-of-school conduct and the school."[54]

KSU analogizes the allegations here to the *Rost*, *Roe*, *Ostrander*, *C.R.K.*, and *Samuelson* cases, in which courts declined to impose Title IX liability for sexual harassment that occurred off school grounds.  KSU further argues that Plaintiff has alleged no facts that would warrant a finding that it exercised substantial control over the harasser and the context in which the harassment occurred.  KSU emphasizes there are no allegations that it owned or operated the fraternity house or bedroom in which the alleged sexual assault occurred, that it knew the party was occurring, or that it had any contemporaneous control over how the party was conducted. KSU further argues it cannot simply enter into fraternity houses to monitor activity, and while the Fourth Amendment permits leeway in entering into on-campus dorm rooms, the same leeway does not apply to private fraternity houses.[55]  KSU argues that even if it had authority to discipline the alleged assailant after the assault, it did not have substantial control over the

---

[51]*Id.* at 430.

[52]*Id.*

[53]*Rost ex rel. K.C. v. Steamboat Springs RE-2 Sch. Dist.*, 511 F.3d 1114, 1121 n.1 (10th Cir. 2008) ("We do not suggest that harassment occurring off school grounds cannot as a matter of law create liability under Title IX"); *see also* 21 U.S.C. § 1687 ("the term 'program or activity' and 'program' mean *all* of the operations of . . . a college, university, or other postsecondary institution, or a public system of higher education." (emphasis added)).

[54]*Davis*, 526 U.S. at 645; *Rost*, 511 F.3d at 1121 n.1.

[55]*Reardon v. Wroan*, 811 F.2d 1025, 1028 & n.2 (7th Cir. 1987).

assailant or the context in which the assault occurred.  According to KSU, "such a notion would make an institution vicariously liable for sexual harassment unless it *remediated* the effects of harassment."[56]  Finally, KSU asserts that it is "unreasonable and unrealistic to suggest that K-State can monitor, let alone regulate, unsanctioned activities that occur at private locations in the community."[57]

The Court finds unpersuasive KSU's arguments that this case is controlled by the outcomes in *Rost*, *Roe*, *Ostrander*, *C.R.K.*, and *Samuelson*.  The facts in those cases are not sufficiently analogous to command the same result in this case.  In *Rost, C.R.K.*, and *Samuelson*, the alleged assaults occurred off school grounds, in private settings, and not in connection with any school activity or organization.[58]  Although the assault here occurred at a private fraternity house, the Court has detailed above the allegations that reflect KSU's substantial control over the fraternity and the assailant.  These allegations demonstrate that KSU had more control over the context of the assault than the schools in *Rost*, *C.R.K.*, and *Samuelson* had over the context of the harassment and assaults in those cases.  Likewise, in *Roe*, the peer assault occurred at a private apartment, rather than at a fraternity house.[59]  As explained above, the fraternity here is subject to oversight by the Office of Greek Affairs, rules promulgated by KSU, and potential discipline of the chapter and its members for conduct that takes place at the fraternity house.  The same cannot be said for the private apartment at issue in *Roe*.  Additionally, in *Ostrander*, the court found that the plaintiff had not offered sufficient evidence to establish that the university *or* the fraternity owned the private on-campus residence where the assault occurred, and thus Title IX

---

[56]Doc. 38 at 17.

[57]*Id.* at 18.

[58]*Rost ex rel. K.C. v. Steamboat Springs RE-2 Sch. Dist.*, 511 F.3d 1114, 1117–18 (10th Cir. 2008); *C.R.K. v. U.S.D. 260*, 176 F. Supp. 2d 1145, 1147 (D. Kan. 2001); *Samuelson v. Or. State Univ.*, 162 F. Supp. 3d 1123, 1126 (D. Or. 2016).

[59]*Roe v. St. Louis Univ.*, 746 F.3d 874, 878 (8th Cir. 2014).

was not implicated.[60]  Here, by contrast, the alleged assault took place at a house owned by the

fraternity, and Plaintiff's allegations reflect that KSU exercises substantial control over the

fraternity.  In sum, these cases simply do not inform the result here because the alleged peer

assaults in those cases occurred in contexts that were not controlled by the funding recipients,

unlike in this case.

To be sure, KSU makes a valid argument that unlike in the dormitory context, the Fourth

Amendment fully applies to private fraternity houses, and a university cannot simply enter a

fraternity house on a whim.[61]  Further, KSU's suggestion that a university has significantly more

control over dormitories than it does off-campus fraternity houses is generally accurate and

unremarkable.  But rather than compelling a particular result in this case, the reference to

dormitories simply helps set the outer bounds of Title IX liability.  At one end, peer sexual

assaults that occur at on-campus dormitories clearly implicate Title IX.[62]  At the other end, peer

sexual assaults that occur off-campus, in private settings, and within contexts that have little or

no connection to the funding recipient do not trigger Title IX liability.[63]  Peer sexual assaults that

occur at off-campus fraternities that are subject to oversight, control, and disciplinary authority

by a university appear to fall somewhere between these two bookends.  Here, as explained

above, the fraternity allegedly is a KSU student organization, is supervised by a faculty advisor,

is overseen by KSU's Office of Greek Affairs, is subject to KSU rules specifically applicable to

---

[60]*Ostrander v. Duggan*, 341 F.3d 745, 750–51 (8th Cir. 2003).

[61]*See* Doc. 38 at 18.

[62]*See J.K. v. Ariz. Bd. of Regents*, No. CV 06-916-PHX-MHM, 2008 WL 4446712, at *12 (D. Ariz. Sept. 30, 2008) (denying funding recipient's summary judgment motion and noting that it was undisputed that "[the university] exercised substantial control over [the alleged student-harasser] and the [university] dormitory in which the alleged harassment took place").

[63]*See, e.g.*, *Rost*, 511 F.3d at 1122; *Roe*, 746 F.3d at 884.  *But see Simpson v. Univ. of Colo. Boulder*, 500 F. 3d 1170, 1178–85 (10th Cir. 2007) (finding plaintiff had presented sufficient evidence that university had substantial control over context of assaults, where assaults occurred at an off-campus apartment pursuant to an official policy that female student "hosts" show football recruits "a good time").

fraternity parties and events, and is subject to chapter investigations by the KSU IFC.  Thus, the Court is convinced that KSU has substantial control over the alleged assailant and the context in which the alleged assault occurred.

KSU's next argument—that because it did not have "contemporaneous control" over the alleged assailant and the fraternity house, it lacked substantial control over the alleged assailant and the context of the sexual assault—is similarly unavailing.[64]  KSU cites *Roe*, *Ostrander*, and *Samuelson* as authority for the proposition that substantial control does not exist where a funding recipient's disciplinary authority is limited to responding post-assault.  The Court, however, is not aware of any suggestion in these or other cases that the term "substantial control" equates to or necessitates "contemporaneous control."  The cases KSU presents appear to turn on findings that the funding recipients lacked *any* control over the contexts of the assaults in those cases, rather than findings that the funding recipients lacked *contemporaneous* control.[65]  Here, although KSU may fairly argue that its agents or employees were not contemporaneously present at the scene of the alleged assaults, Plaintiff's allegations reflect that *both* the fraternity and the alleged assailant were subject to pre-assault oversight and post-assault disciplinary control by KSU.[66]

Finally, Contrary to KSU's contention, the Court is not convinced that a finding that Plaintiff has plausibly alleged KSU had substantial control over the context and alleged perpetrators of the assaults in this case will require KSU to monitor, regulate, and remediate all

---

[64] *See* Doc. 38 at 18.

[65] *Roe*, 746 F.3d at 874; *Ostrander v. Duggan*, 341 F.3d 745, 750–51 (8th Cir. 2003); *Samuelson v. Or. State Univ.*, 162 F. Supp. 3d 1123, 1132–32 (D. Or. 2016).

[66] *See Simpson*, 500 F.3d at 1177–78 (finding that university had substantial control over context of assaults that allegedly occurred at off-campus apartment and without any apparent supervision by university officials, where assaults occurred pursuant to policy to show football recruits a "good time").

sexual harassment that occurs "at private locations in the community."[67]  Rather, the Court

simply finds that Plaintiff has presented plausible allegations in this case that KSU had

substantial control over the fraternity (a KSU student organization) and the alleged assailant,

thereby triggering a duty to adhere to the mandate of Title IX—that is, respond to Plaintiff's

report of rape in a way that was not deliberately indifferent or "clearly unreasonable."[68]

### 2.      Causation of Further Harassment

KSU argues for dismissal because Plaintiff has failed to allege that KSU's deliberate

indifference to her report of rape caused her to suffer further harassment.  Plaintiff does not

contest that she has not alleged further harassment, in the strictest sense, at the hands of the

alleged assailant after her report of sexual assault.[69]  Rather, she alleges that the continued

presence of the alleged assailant on campus caused her fear, which ultimately caused a

deprivation of her educational access in the form of missing classes, declining academic

performance, depression, and self-destructive behaviors.[70]  KSU does not argue that Plaintiff has

failed to allege sexual discrimination that deprived her access to the educational benefits or

opportunities provided by KSU.[71]  Thus, the parties do not dispute that plaintiff has alleged a

deprivation of her educational access but has not alleged further harassment following her report

of sexual assault.  The Court is therefore left with the purely legal question whether it is enough

for a Title IX plaintiff to allege a deprivation of her educational access and that the funding

recipient's deliberate indifference left her liable or vulnerable to further harassment, or whether

---

[67]Doc. 38 at 17–18.

[68]*See Rost*, 511 F.3d at 1123 (citing *Davis ex rel. LaShonda D. v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 648 (1999)) ("The Supreme Court has noted that administrators need not 'engage in particular disciplinary action' under Title IX, but only respond in a manner that is not clearly unreasonable").

[69]*See* Doc. 33 at 20–24 (plaintiff arguing that she "need not show she was assaulted or harassed again").

[70]Doc. 1 at 6, 9.

[71]*See generally* Docs. 15 & 38.

she must also allege further harassment actually occurred after the funding recipient was on notice of the initial harassment.

The foundation of KSU's argument begins with *Davis*, in which the Supreme Court discussed the scope of Title IX liability.[72]  The Court explained:

> The statute's plain language confines the scope of prohibited conduct based on the recipient's degree of control over the harasser and the environment in which the harassment occurs. If a funding recipient does not engage in harassment directly, it may not be liable for damages unless its deliberate indifference "subject[s]" its students to harassment. That is, the deliberate indifference must, at a minimum, *"cause [students] to undergo" harassment or "make them liable or vulnerable"* *to it*.[73]

Since *Davis*, courts have repeatedly echoed this last statement—that the funding recipient's deliberate indifference must " cause students to undergo" or make them "liable or vulnerable to" harassment.[74]

KSU focuses on two Tenth Circuit cases, *Escue v. Northern Oklahoma College* and *Rost*, to advance its argument that a Title IX plaintiff must allege further harassment.  In *Escue*, the court affirmed the district court's grant of summary judgment in favor of the university on the plaintiff's Title IX claims in part because the court found that the university was not deliberately indifferent to the student's reports of inappropriate touching and sexual comments by a professor.[75]  The court explained that the school's response to the report—which included removing the student from the harassing environment, questioning the student's peers and the professor about the charges, and preventing the professor from teaching any other classes after

---

[72]526 U.S. 629, 644–45 (1999).

[73]*Id.* (emphasis added).

[74]*See Rost ex rel. K.C. v. Steamboat Springs RE-2 Sch. Dist.*, 511 F.3d 1114, 1123–24 (10th Cir. 2008); *Simpson v. Univ. of Colo. Boulder*, 500 F.3d 1170, 1177 (10th Cir. 2007); *Escue v. N. Okla. Coll.*, 450 F.3d 1146, 1155 (10th Cir. 2006).

[75]450 F.3d at 1155–56.

the semester ended—was not "clearly unreasonable in light of known circumstances."[76]  The

court then made the following observation:

> Significantly, we note that [the plaintiff] does not allege that further sexual
> harassment occurred as a result of NOC's deliberate indifference. The Supreme
> Court has stated that "the deliberate indifference must, at a minimum, cause
> students to undergo harassment or make them liable or vulnerable to it."  For
> instance, in *Theno* [*v. Tonganoxie Unified School District Number 464*]*,* a student
> was subjected to years of harassment by his peers. Although the school responded
> to discrete incidents, it issued only warnings to the perpetrators and sometimes
> required them to undergo counseling. Despite these measures, the student was still
> harassed. The *Theno* court found that summary judgment was inappropriate
> because "a reasonable jury certainly could conclude that at some point during the
> four-year period of harassment the school district's standard and ineffective
> response to the known harassment became clearly unreasonable."
>
> [The plaintiff's] arguments do not present a similar situation. At no point does she
> allege that NOC's response to her allegations was ineffective such that she was
> further harassed. Although [the professor] attempted to contact her once the day
> that she reported her allegations to [the university president], he was unsuccessful
> and this incident did not lead to sexual harassment. Summary judgment on these
> facts is therefore appropriate, as [the plaintiff] has not shown that NOC's response
> was clearly unreasonable nor has she shown that it led to further sexual
> harassment.[77]

In *Rost*, the court affirmed the district court's ruling that the student had not met her

burden at summary judgment to present evidence that the school district acted with deliberate

indifference to her reports of sexual harassment.[78]  The court emphasized the undisputed facts

that after the student reported the sexual harassment, the school immediately contacted its school

resource officer, who questioned the student about the harassment, and the principal had

"approximately fifty conversations" with the officer regarding the investigation and received the

officer's report.[79]  Citing *Escue*, the court then observed that the plaintiff did "not contend that

---

[76] *Id.* at 1155.

[77] *Id.* at 1155–56 (citations omitted).

[78] 511 F.3d 1114, 1123–24 (10th Cir. 2008).

[79] *Id.* at 1121.

further sexual harassment occurred as a result of the district's deliberate indifference after [the student]'s disclosure in 2003."[80]  The Court acknowledged that several circuits have "rejected a strict causation analysis which would absolve a district of Title IX liability if no discrimination occurs after a school district receives notice of discrimination."[81]

The court further noted that the Eleventh Circuit, in *Williams v. Board of Regents of the University System of Georgia*, held that Title IX discrimination can occur where a university fails to timely respond or take precautions to prevent further attacks.[82]  The court found that, unlike in *Williams*, the school district's response did not "cause [the student] to undergo harassment or make her liable or vulnerable to it," and in fact "the district took steps to prevent further harassment of [the student]."[83]  Ultimately, the court found the record reflected that the district did not act with deliberate indifference.[84]  But the court explained in dicta that if the student, whose mother had removed her entirely from the school district, "had expressed interest in returning to the school and school officials had not provided a safe educational environment, then she would likely have a Title IX claim.  But that is not this case."[85]

KSU interprets *Escue* and *Rost* as creating a requirement under *Davis* that a Title IX claimant undergo further harassment after an initial report of harassment.  For several reasons, the Court finds this interpretation unpersuasive.  First, the courts in *Escue* and *Rost* discussed the absence of further harassment in the context of analyzing the deliberate indifference element,

---

[80] *Id.* at 1123.

[81] *Id.*

[82] *Id.* (citing *Williams v. Bd. of Regents of the Univ. Sys. of Ga.*, 477 F.3d 1282, 1297 (11th Cir. 2007)).

[83] *Id.* at 1123–24.

[84] *Id.* at 1124.

[85] *Id.*

rather than analyzing causation of further harassment as a stand-alone element.[86]  The courts explained the absence of further harassment to emphasize the lack of deliberate indifference.[87] Unlike in those cases, here KSU does not argue that Plaintiff has failed to plead deliberate indifference.

Second, the courts in *Escue* and *Rost* did not state that further harassment was a requirement that all Title IX claimants must establish, but simply noted the absence of further harassment, and in *Escue* explained that it was "significant" to its determination on deliberate indifference.[88]  Declining to impose a strict further harassment requirement is consistent with *Davis*, in which the Court explained that funding recipients "may be held liable for 'subjecting' their students to discrimination where the recipient is deliberately indifferent to known acts of student-on-student sexual harassment."[89]

Third, KSU argues that the court in *Rost*, by recognizing the lack of further harassment that case, rejected the approach of the Eleventh Circuit in *Williams* that Title IX liability attaches where a "university fails to timely respond or take precautions to prevent further attacks."[90]  But the court in *Rost* simply distinguished *Williams*, rather than rejected its approach.  After citing *Williams*, the court explained that "[h]ere the district's response did not cause [the student] to

---

[86]*Id.* at 1123–24; *Escue v. N. Okla. Coll.*, 450 F.3d 1146, 1155–56 (10th Cir. 2006).

[87]*See Rost*, 511 F.3d at 1123 (explaining that student did not "contend that further harassment occurred as a result of the district's deliberate indifference after [her] disclosure in January 2003"); *Escue*, 450 F.3d at 1156 ("at no point does [the student] allege that [the university's] response to her allegations was ineffective such that she was further harassed"); *see also Ha v. N.W. Univ.*, No. 14 C 895, 2014 WL 5893292, at *2 (N.D. Ill. Nov. 13, 2014) (noting lack of further harassment in context of discussing deliberate indifference); *Thomas v. Meharry Med. Coll.*, 1 F. Supp. 3d 816, 826–27 (M.D. Tenn. 2014) (finding that because plaintiff did not allege continuing harassment following his filing of a sexual harassment report, there was no basis to find defendant's response deliberately indifferent).

[88]*See Rost*, 511 F.3d at 1123; *Escue*, 450 F.3d at 1155.

[89]*Davis ex rel. LaShonda D. v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 646–47 (1999).

[90]*Rost*, 511 F.3d at 1123 (citing *Williams v. Bd. of Regents of the Univ. Sys. of Ga.*, 477 F.3d 1282, 1297 (11th Cir. 2007)).

undergo harassment or make her liable or vulnerable to it.  Unlike the situation in *Williams*, the district took steps to prevent further harassment of [the student] by working with [her mother] to find safe educational alternatives."[91]  In fact, the *Rost* court explained in dicta that if the student had expressed interest in returning to the school and the school district had employed the same course of conduct described in *Williams*—that is, "not provided a safe educational environment"—then there would have been a basis for Title IX liability.[92]

Finally, the courts that have directly addressed this issue have held that *Davis* requires that the funding recipient's deliberate indifference leave the student "liable or vulnerable to" further harassment, not that further harassment actually occur.[93]  Courts have consistently recognized that a student need not allege multiple instances of sexual assault to state a plausible Title IX claim.[94]

Where, as here, there is no question that the plaintiff has alleged (1) deliberate indifference on the part of the funding recipient,[95] (2) that the assault was so severe, pervasive, and offensive as to deprive her of the benefits and opportunities of a federally funded education

---

[91]*Id.* at 1123–24 (internal citations omitted).

[92]*Id.* at 1124.

[93]*E.g., Kinsman v. Fla. State Univ. Bd. of Trs.*, No. 4:15CV235-MW/CAS, 2015 WL 11110848, at *4 (N.D. Fla. Aug. 12, 2015) (quoting *Kelly v. Yale Univ.*, No. 3:01-CV-1591, 2003 WL 1563424, at *4 (D. Conn. Mar. 26, 2003)) (holding that "[i]t does not require mental gymnastics" to conclude that further encounters "between a rape victim and her attacker could create an environment sufficiently hostile to deprive the victim of access to educational opportunities provided by a university."); *Karasek v. Regents of the Univ. of Cal.*, No. 15-CV-03717-WHO, 2015 WL 8527338, at *12 (N.D. Cal. Dec. 11, 2015) (citing cases that "all recognize that it is possible for a plaintiff to bring a Title IX claim against an educational institution even in the absence of any further affirmative acts of harassment by the alleged harasser or other students or faculty."); *Doe ex rel. Doe v. Derby Bd. of Educ.*, 451 F. Supp. 2d 438, 444 (D. Conn. 2006) ("even absent actual post-assault harassment . . . the fact that [the alleged assailant] and plaintiff attended school together could be found to constitute pervasive, severe, and objectively offensive harassment.").

[94]*E.g., Karasek*, 2015 WL 8527338, at *12 (rejecting notion "that a student must be harassed or assaulted a second time before the school's clearly unreasonable response to the initial incident becomes actionable"); *T.Z. v. City of N.Y.*, 634 F. Supp. 2d 263, 270–71 (E.D.N.Y. 2009) (collecting cases and holding that "a sufficiently serious one-time sexual assault may satisfy the 'pervasiveness' requirement of the *Davis* standard."); *Roe ex rel. Callahan v. Gustine Unified Sch. Dist.*, 678 F. Supp. 2d 1008, 1027 (E.D. Cal. 2009).

[95]Doc. 1 at 18; Doc. 38 at 12 n.3 (stating KSU does not challenge Plaintiff's allegations as to deliberate indifference).

program,[96] and (3) that the funding recipient's alleged deliberate indifference left her "liable or vulnerable to" further assaults or harassment,[97] the Court is not inclined to require that the plaintiff additionally allege that post-report assault or harassment actually occurred.  Rather, the Court is satisfied that Plaintiff has alleged the traditional Title IX elements previously outlined by the Tenth Circuit, as well as that KSU's response made her "liable or vulnerable to" further harassment pursuant to *Davis*.[98]

The Court finds that Plaintiff has alleged the elements required to state a plausible Title IX harassment claim.  Specifically, the Court finds that Plaintiff has plausibly alleged that KSU had substantial control over the alleged assailants and the context of the assaults, which were so severe as to deny Plaintiff access to educational benefits and opportunities, and that KSU's alleged deliberate indifference to her report of rape made her "liable or vulnerable" to further harassment or assault.  Accordingly, the Court denies KSU's motion to dismiss as it relates to Count 1.

### B.        Count 2—Kansas Consumer Protection Act Claim

Plaintiff claims a violation of the KCPA in Count 2 of her Complaint.  She alleges KSU made written statements in its promotional materials, as well as oral statements, misrepresenting its fraternities as safe, concealing the risks of sexual assault, and omitting its policy of

---

[96]Doc. 1 at 6, 9, 16–17 (Plaintiff alleging that fear of encountering assailant caused her depression, declining attendance in classes, and reduced engagement in campus leadership roles, and alleging that sighting of assailant on campus "threw her into a panic attack, her heart racing, crying hysterically, and unable to catch her breath").

[97]*Id.* at 17 (alleging Plaintiff's fear of encountering assailant, and alleging that KSU's response made her more vulnerable to rape).

[98]*Rost ex rel. K.C. v. Steamboat Springs RE-2 Sch. Dist.*, 511 F.3d 1114, 1119 (10th Cir. 2008) (citing *Murrell v. Sch. Dist. No. 1, Denver, Colo.*, 186 F.3d 1238, 1246 (10th Cir. 1999)); *Davis ex rel. LaShonda D. v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 644–45 (1999).

.

indifference toward sexual assault at its fraternities.  Plaintiff further alleges KSU made these representations when it knew or had reason to know (1) of many incidents of sexual assault at its fraternities, (2) that it would refuse to investigate such assaults; and (3) that the statements it made were misleading.

### 1.      Rule 9(b)

Pursuant to Fed. R. Civ. P. 9(b), when "alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."  This provision "applies to allegations of deceptive trade practices under the KCPA."[99]  Thus, to survive a motion to dismiss, an allegation of deceptive practices under the KCPA "must set forth the time, place, and contents of the false representation, the identity of the party making the false statements and the consequences thereof."[100]

In *Jamieson v. Vatteron Educational Center, Inc.*, a group of former students brought a KCPA claim against Vatterot, alleging that the education institution's agents and employees made verbal and written representations to the students, before and during their enrollments, about

> the completeness of the courses of study; the qualifications and competence of the faculty; the materials and equipment provided by Vatterott as part of the course of study; the accreditations Vatterott had received for the courses of study; Vatterott's job placement rates; and type and level of skills, training, and education Plaintiffs would obtain upon completion of their courses of study and their ability to obtain entry-level positions.[101]

---

[99]*Thompson v. Jiffy Lube Int'l Inc.*, 505 F. Supp. 2d 907, 930 (D. Kan. 2007) (citing *In re Univ. Serv. Fund Tel. Billing Practices Litig.*, 300 F. Supp. 2d 1107, 1150 (D. Kan. 2003)).

[100]*Id.* at 930 (internal quotation marks and citations omitted).

[101]473 F. Supp. 2d 1153, 1155 (D. Kan. 2007).

The students further alleged Vatterott and its representatives "knowingly made false representations about the qualifications and possession of its sponsorships, accreditations, placement rates, status, [and] affiliations."[102]

In granting Vatterott's motion to dismiss, this Court found that the students failed to plead their KCPA claim with particularity in accordance with Rule 9(b).[103]  Specifically, the Court found that the students had not alleged the time, place, or contents of the false representations, or the identity of the speakers.[104]  First, the Court found that although the students had identified the subject of the misrepresentation, they failed to make any specific allegation about the content of the misrepresentation.[105]  Second, the students' allegation that the statements were made "before and during their enrollments" did not satisfy the particularity requirement as to "when" the statements were made.[106]  Third, the Court found the students failed to allege the place of the misrepresentations, as there was "absolutely no allegation about the location of the verbal misrepresentations" and the complaint did not specify whether the written misrepresentations were made on brochures, personalized letters, bills, e-mails, or any other form of written communication.[107]  Finally, the Court held that although the students "identified the types of employees who made misrepresentations (i[.]e. personnel working in admissions, career services, and financial aid), they [had] not identif[ied] who, within these broad classes of employees, made misrepresentations."[108]

---

[102]*Id.*

[103]*Id.* at 1156.

[104]*Id.* at 1156–58.

[105]*Id.* at 1157.

[106]*Id.*

[107]*Id.* at 1157–58.

[108]*Id.* at 1158.

The Court finds that, as in *Jamieson*, Plaintiff here has failed to plead her KCPA claim with particularity.  First, although Plaintiff alleges KSU made misrepresentations "regarding the safety of its fraternities, the risks of sexual assault at its fraternities, its position against investigating sexual assault at its fraternities, and its indifference to sexual assault at its fraternities," she does not allege with particularity the contents of these representations.  Second, Plaintiff does not allege when the misrepresentations were made.  Plaintiff alleges KSU made representations regarding the safety of its fraternities in materials to prospective students and their parents, thereby suggesting that the statements were made before her enrollment.  She also suggests in her responsive brief that the misrepresentations continued after she became a student, although she does not identify the content of these later representations.[109]  As this Court explained in *Jamieson*, allegations reflecting such broad time periods are not sufficiently particular for purposes of Rule 9(b).[110]  Third, Plaintiff does not allege the place where either the verbal or written representations were made.  Plaintiff alleges KSU made written statements regarding the safety of its fraternities to parents and prospective students, but does not identify where these statements were printed, and only refers generally to "promotional materials" and KSU's website.[111]  Finally, Plaintiff identifies KSU as the entity responsible for making the representations, but does not specify the employees or agents of the university who actually made the verbal and written representations.  Presented with these allegations, the Court finds that Plaintiff has not satisfied the Rule 9(b) particularity requirement.

---

[109] *See* Doc. 33 at 31.

[110] *Jamieson*, 473 F. Supp. 2d at 1157.

[111] *See* Doc. 1 ¶¶ 51–54, 65–66.

2.      **Requirement of Pleading Plaintiff was "Aggrieved"**

In addition to pleading the when, where, what, and who of the alleged misrepresentations, a plaintiff bringing a KCPA claim must allege she is an "aggrieved consumer," that is, she "suffered some 'loss or injury' as a result of the violation."[112] In *Finstad v. Washburn University of Topeka*, students in the Washburn University paralegal program alleged a KCPA violation based on misrepresentations in the University's course catalog advertising the program as accredited, when in fact it was not.[113] The district court granted the University's motion for summary judgment because the students had not demonstrated a causal link between the University's false statement and the injuries the students suffered as a result of their enrollment in the program.[114] In upholding the district court's finding, the Kansas Supreme Court clarified that the KCPA incorporates a causation requirement based on the requirement that a plaintiff bringing a private cause of action under the Act suffer some loss or injury "as a result of the violation" of the Act.[115] Because the students did not rely on the false statement, they could not establish that they were "aggrieved" by a KCPA violation.[116] The court further explained that

> many, if not all, of the students were unaware of the statement.  Many enrolled prior to the publication of the statement in the university catalogue.  Nor is there any showing that any of the students suffered injury or loss as a result of the publication of the statement.  The students enrolled and paid the tuition.  By so doing, they were consumers under the KCPA; however, the Act requires more in that they must also be aggrieved by the violation.[117]

---

[112] *Caputo v. Prof'l Recovery Servs., Inc.*, 261 F. Supp. 2d 1249, 1261 (D. Kan. 2003) (citing *Finstad v. Washburn Univ.*, 845 P.2d 685 (Kan. 1993)).

[113] 845 P.2d at 692.

[114] *Id.* at 688.

[115] *Id.* at 692.

[116] *Id.* at 691.

[117] *Id.*

Similarly, the Court finds here that Plaintiff has failed to allege plausible facts that she was an "aggrieved" consumer within the meaning of the KCPA.  Plaintiff makes a single conclusory allegation in her Complaint that "she is 'aggrieved' as that term is used in K.S.A. §§ 50-634 and 636."[118]  But she does not allege that she was aware of, much less relied on, KSU's representations regarding its perception of the safety of its fraternities or its position concerning sexual assaults in fraternities.  Plaintiff points to several alleged statements on KSU's website and in its publications touting its fraternities as safe and fun experiences, but she does not allege that these representations were factors in her decision to visit the fraternity house on March 6, 2015.  Thus, the Court finds that Plaintiff has failed to plead the element of causation required to plausibly allege that she was an "aggrieved consumer" under the KCPA.

Because Plaintiff has not pleaded the elements of her KCPA claim with particularity, and because she has not presented plausible allegations that she was "aggrieved" by KSU's alleged violation of the KCPA, the Court dismisses Plaintiff's KCPA claim.  Plaintiff requests in passing in her response that the Court grant her leave to amend her Complaint to plead her claims with particularity in the event the Court finds her allegations insufficient to state a KCPA claim.  D. Kan. Rule 15.1 requires that a party moving for leave to amend attach a proposed pleading so that the Court can determine whether leave to amend is appropriate.[119]  "This Court does not routinely grant leave to amend a motion to dismiss in the absence of a motion for leave to amend, or at least some representation that there are additional facts that may cure the deficiency."[120]  Plaintiff provides neither a proposed pleading nor any indication that she can

---

[118]Doc. 1 at 21.

[119]D. Kan. Rule 15.1.

[120]*McCoy v. City of Independence, Kan.*, No. 12-1211-JAR-JPO, 2013 WL 424858, at *1 n.3 (D. Kan. Feb. 4, 2013).

present additional facts to cure the deficiencies the Court has identified above.  Accordingly,

Plaintiff is denied leave to amend and her Count 2 KCPA claim is dismissed.

### C.      Count 3—Negligence Claim

Plaintiff brings a negligence claim in Count 3 of her Complaint, alleging KSU breached

its duty to regulate, warn, protect her from, or otherwise make reasonably safe the foreseeably

dangerous environment at the fraternity house relevant to this case.  This suit is subject to the

Kansas Tort Claims Act ("KTCA") because KSU, as a political subdivision of the state, is a

"municipality" within the meaning of the KTCA.[121]  The KTCA provides:

> (a) Subject to the limitations of this act, each governmental entity shall be liable
> for damages caused by the negligent or wrongful act or omission of any of its
> employees while acting within the scope of their employment under
> circumstances where the governmental entity, if a private person, would be liable
> under the laws of this state.[122]

The Kansas Supreme Court has explained that

> the analytical matrix established by the legislature in enacting the KTCA dictates
> that a governmental entity can be found liable for the negligent or wrongful act or
> omission of any of its employees while acting within the scope of their
> employment only if (1) a private person could be liable under the same
> circumstances and (2) no statutory exception to liability applies.[123]

The Court first addresses whether a private person could be liable under the same

circumstances.  There is no dispute that a private person can be liable for negligence.[124]  Thus,

the Court must determine whether Plaintiff has alleged a plausible negligence claim.  The

familiar elements of a negligence claim are (1) the defendant owed a duty to the plaintiff; (2) the

---

[121]K.S.A. 75-6102(b).

[122]K.S.A. 75-6102(a).

[123]*Adams v. Bd. of Sedgwick Cty. Comm'rs,* 214 P.3d 1173, 1179 (Kan. 2009).

[124]*Thomas v. Cty. Comm'rs of Shawnee Cty.* 262 P.3d 336, 352 (Kan. 2011) (citing *Adams,* 214 P.3d 1173).

defendant breached this duty; (3) the breach was the proximate cause of the plaintiff's injury; and (4) the plaintiff sustained injuries.[125]

KSU argues that Plaintiff fails to allege facts demonstrating that KSU owed her a legal duty. Plaintiff responds that she "sufficiently pled facts showing K-State controlled its fraternity system, thereby assuming a legal duty."[126]  Whether a duty exists is a question of law.[127]  "It is the general rule that an actor has no duty to control the conduct of a third person to prevent that person from causing harm to others unless a 'special relationship' exists between the actor and the third party or the actor and the injured party."[128]  In *Nero v. Kansas State University*, the Kansas Supreme Court held that the "university-student relationship does not in and of itself impose a duty upon universities to protect students from the actions of fellow students or third parties.  The in loco parentis doctrine is outmoded and inconsistent with the reality of contemporary college life."[129]  Nevertheless, the *Nero* court overturned the trial court's grant of summary judgment in favor of the university on the student's negligence claim, which was based on allegations of sexual assault by another student at a coed residence hall on the university's campus.[130]  The court found that the university owed the student a duty of reasonable care based on its landlord-tenant relationships with both the victim and the alleged assailant.[131]

Based on the holdings in *Nero* and its progeny, the Court finds that the university-student relationships between KSU, Plaintiff, and the alleged assailants do not give rise to a legal duty

---

[125]*E.g.*, *Adams*, 214 P.3d at 1179 (citing *Hesler v. Osawatomie State Hosp.*, 971 P.2d 1169 (Kan. 1999)).

[126]Doc. 33 at 32.

[127]*Adams*, 214 P.3d at 1179–80 (citing *Nero v. Kan. State Univ.*, 861 P.2d 768 (Kan. 1993)).

[128]*Nero*, 861 P.2d at 772 (citing *Thies v. Cooper*, 753 P.2d 1280 (Kan. 1988)).

[129]861 P.2d at 773–78; *see also Howell v. Calvert*, 1 P.3d 310, 313 (Kan. 2000); *Wellhausen v. Univ. of Kan.*, 189 P.3d 1181, 1185 (Kan. Ct. App. 2008).

[130]*Nero*, 861 P.2d at 779–80.

[131]*Id.*

owed to Plaintiff. Although Plaintiff asserts that KSU owed a duty of reasonable care to her based on KSU's control of its fraternity system, this does not provide the basis for a legal duty. As explained above, the special relationship doctrine depends on a relationship between the actor (here, KSU) and either the injured party (Plaintiff) or the third party (the alleged assailant). KSU's control of its fraternity system does not create a special relationship between the parties beyond that of a university and its students. Furthermore, to the extent Plaintiff asserts the existence of a duty premised on a landlord-tenant relationship similar to that at issue in *Nero*, this argument is also foreclosed, as KSU is not a landlord or owner of the fraternity house, and the fraternity house is not on KSU property.[132] In sum, the Court finds that because Plaintiff has not alleged the existence of a special relationship between KSU and either her or the alleged assailant, she has not presented plausible allegations that KSU owed her a legal duty. Accordingly, the Court dismisses Plaintiff's Count 3 negligence claim.[133]

## IV.    Conclusion

Plaintiff has presented plausible allegations as to each element required to state a Title IX discrimination claim, including that KSU had substantial control over both the alleged assailant and the context of the alleged assault, and that KSU's alleged deliberate indifference made Plaintiff liable or vulnerable to further harassment or assaults. Accordingly, the Court denies KSU's motion to dismiss as to Count 1. The Court, however, grants KSU's motion as to Count 2

---

[132]*See Nero*, 861 P.2d at 779–80 (finding that negligence claim premised on landlord-tenant relationship could proceed because university, as a "landlord furnishing housing to its students in competition with private landlords[, ]owes a duty of reasonable care to its tenants"); *Gragg v. Wichita State Univ.*, 934 P.2d 121, 133 (Kan. 1997) (distinguishing *Nero* on basis of landlord-tenant liability); *Howell*, 1 P.3d at 313 ("*Nero* holds that a university has a duty to regulate and supervise foreseeable dangers and activities occurring *on* its property." (emphasis in original)).

[133]Because the Court finds that plaintiff has not alleged the existence of a legal duty, the Court does not address the remaining elements of her negligence claim or the immunities implicated by the second prong of the KTCA "analytical matrix." *See Adams v. Bd. of Sedgwick Cty. Com'rs*, 214 P.3d 1173, 1190 (Kan. 2009) (citing *Hesler v. Osawatomie State Hosp.*, 971 P.2d 1169 (Kan. 1999)) (explaining that "[b]ecause we conclude that there was no duty, we need not address the question of whether" the various KTCA immunities apply).

because Plaintiff has failed to plead the elements of her KCPA claim with particularity and has failed to plausibly allege that she was an "aggrieved consumer."  Further, the Court denies Plaintiff leave to amend her KCPA claim because she has not attached a proposed pleading to her motion and has not indicated any additional facts that would cure her pleading deficiencies. Finally, the Court grants KSU's motion as to Count 3 because Plaintiff has not presented plausible allegations to support a finding that KSU owed her a legal duty.

**IT IS THEREFORE ORDERED BY THE COURT** that Defendant Kansas State University's Motion to Dismiss for Failure to State a Claim (Doc. 14) is **granted in part and denied in part.**  Defendant's motion is **denied** as to Plaintiff Tessa Farmer's Count 1 Title IX claim, and **granted** as to Plaintiff's Count 2 KCPA and Count 3 Negligence claims.  Plaintiff is **denied** leave to amend her Count 2 KCPA claim.

**IT IS SO ORDERED.**

Dated: March 13, 2017

S/ Julie A. Robinson
JULIE A. ROBINSON
UNITED STATES DISTRICT JUDGE